**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE GLUCAGON-LIKE PEPTIDE-1 RECEPTOR AGONISTS (GLP-1 RAS) NON-ARTERITIC ISCHEMIC OPTIC NEUROPATHY PRODUCTS LIABILITY LITIGATION | MDL NO. 3163<br><br>THIS DOCUMENT RELATES TO ALL CASES<br><br>JUDGE KAREN SPENCER MARSTON |
| LORNE HARARI,<br><br>Plaintiff,<br>v.<br><br>NOVO NORDISK INC., and NOVO NORDISK A/S,<br><br>Defendants. | COMPLAINT AND JURY DEMAND<br><br>CIVIL ACTION NO.: 2:26-cv-08726 |

## COMPLAINT AND JURY DEMAND

COMES NOW, Plaintiff, LORNE HARARI, by and through the undersigned counsel, and brings this complaint against Defendant Novo Nordisk Inc. hereinafter "Defendant" or "Novo Nordisk"), for damages suffered by LORNE HARARI who was severely injured as a result of Defendant's widespread marketing of its drug, RYBELSUS, and his subsequent use of RYBELSUS, a prescription medication that is approved for improvement of blood sugar (glucose) in adults with type 2 diabetes, and alleges as follows:

## PARTIES, JURISDICTION AND VENUE

1. At all relevant times hereto, Plaintiff LORNE HARARI was a resident and citizen of the state of Florida in the county of Broward.

2. Plaintiff was prescribed and took Rybelsus as directed by his physicians.

3. As a result of his use of Rybelsus, LORNE HARARI developed non-arteritic anterior ischemic optic neuropathy (NAION) suffers severe physical and emotional injuries and

radical changes to his lifestyle given his severe loss of sight.

4. Novo Nordisk Inc. ("Novo Nordisk") is a Delaware corporation that has its principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey 08536.

5. Defendant Novo Nordisk Inc. is wholly owned by Novo Nordisk US Commercial Holdings, Inc.

6. Defendants John Doe Corporations 1-10 are the fictitious names of corporations, partnerships, or other business entities or organizations whose identities are not presently known, and who are the alter egos of or are otherwise responsible for the conduct or liability of those who developed, manufactured, packaged, sold, supplied, purchased, marketed, promoted, advertised, distributed, labeled, sold, and/or retained profits from Rybelsus.

7. Upon information and belief, Defendant failed to warn physicians and the end users of Rybelsus of the complications and devastating effects of which the companies knew or should have known, including NAION, which can result in blindness and permanent vision loss.

8. Upon information and belief, Defendant failed to warn the end users of Rybelsus of the complications and devastating effects of which the company knew or should have known.

9. Upon information and belief, Defendant's marketing was deceptive and misleading about the true risks associated with the use of Rybelsus, risks which the companies knew or should have known.

## BACKGROUND

### I. An Accidental Blockbuster: The Development of Ozempic, Wegovy, and Rybelsus

10. In the early 1990s, Novo Nordisk researchers discovered that when they injected into rats a chemical compound known as liraglutide—a GLP-1 (glucagon-like peptide-1) agonist—the drug caused the rats to stop eating almost entirely.[1]

11. GLP-1 agonists are a class of medications that can help lower blood sugar levels and promote weight loss.[2] An agonist is a manufactured substance that attaches to a cell receptor and causes the same action as the naturally occurring substance.[3] Thus, GLP-1 agonists work by mimicking a naturally occurring GLP-1 hormone.

12. To describe the process in other words, GLP-1 medications bind to GLP receptors to trigger the effects (or roles) of the GLP-1 hormone. The higher the dose of the GLP-1 agonist, the more extreme the effects.[4]

13. "These rats, they starved themselves," said one Novo Nordisk scientist, Lotte Bjerre Knudsen, in a video series released by the Novo Nordisk Foundation, "so we kind of knew there was something in some of these peptides that was really important for appetite regulation."[5]

14. Later testing in human subjects revealed that those who received an intravenous drip of GLP-1 agonist ate 12% less at a lunch buffet than those who got a placebo.[6]

15. Consequently, Novo Nordisk decided to study liraglutide as not only a diabetes drug which had been shown to lower blood sugars, but also as a drug to treat obesity.[7]

---

[1] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited Sept. 17, 2023)
[2] https://my.clevelandclinic.org/health/articles/13901-glp-1-agonists (last visited Sept. 17, 2023)
[3] *Id.*
[4] *Id.*
[5] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited Sept. 17, 2023).
[6] *Id.*
[7] *Id.*

16. Years later, in 2010, liraglutide was approved for the treatment of diabetes by the FDA under Novo Nordisk's brand name Victoza,[8] at which point Novo Nordisk moved forward with studying the drug for weight loss.[9]

17. After clinical trials, in 2014, the FDA approved liraglutide as a daily injectable for treatment of obesity under Novo Nordisk's brand name, Saxenda.[10]

18. Saxenda's effects on weight loss, however, were modest; patients lost about 5% of their weight.[11]

19. In an effort to find ways to make a longer-lasting GLP-1 agonist so patients would not have to inject themselves every day, Novo Nordisk created a new molecule with the chemical name semaglutide.[12]

20. Novo Nordisk branded semaglutide as Ozempic, and on December 5, 2016, the Novo Nordisk Defendant announced submission of Ozempic's new drug application (NDA) to the FDA for regulatory approval of a once-weekly injectable, in 0.5 mg or 1 mg doses, for treatment of Type 2 diabetes. In the announcement, Defendant represented that in clinical trials "once-weekly" Ozempic had a safe and well-tolerated profile, and Defendant represented that the most common adverse event was nausea.[13]

---

[8] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2957743/#:~:text=The%20incretin%20mimetic%20liraglutide%20(Victoza,adults%20with%20type%2D2%20diabetes.&text=Liraglutide%20is%20also%20approved%20in%20Europe%20and%20Japan (last visited Sept. 18, 2023).
[9] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited Sept. 17, 2023).
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] https://ml.globenewswire.com/Resource/Download/d2f719e1-d69f-4918-ae7e-48fc6b731183 (last visited Sept. 17, 2023).

21. On December 5, 2017, the FDA approved the Ozempic application and granted premarket approval as NDA 209637.[14]

22. When Novo Nordisk announced that they had started selling Ozempic in the United States, they touted the medication as a "new treatment option[]" that "addresses the concerns and needs of people with diabetes[.]"Novo Nordisk offered an "Instant Savings Card to reduce co-pays to as low as $25 per prescription for up to two years."

23. In addition to diabetic control, Ozempic also caused 15% weight loss, which was three times the loss caused by its predecessor, Saxenda.[15]

24. Just one year after Ozempic's approval for diabetes, Defendant started a clinical trial in patients who were overweight or suffered from obesity.[16]

25. The results of the trial demonstrated that for participants who were overweight or obese, 2.4 mg of semaglutide, once weekly, plus lifestyle intervention was associated with sustained, clinically relevant reduction in body weight.[17]

26. On March 20, 2019, Defendant submitted a supplemental new drug application (sNDA) for Ozempic 0.5 mg or 1 mg injection, requesting approval to expand its marketing of Ozempic by adding an indication to reduce the risk of major adverse cardiovascular events in adults

---

[14] https://www.accessdata.fda.gov/Ozempicatfda_docs/appletter/2017/209637s000ltr.pdf (last visited Sept. 17, 2023).
[15] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited Sept. 17, 2023).
[16] *Id.*
[17] https://www.nejm.org/doi/full/10.1056/NEJMoa2032183 (last visited Sept. 17, 2023)

with type 2 diabetes and established cardiovascular disease.[18] On January 16, 2020, the FDA approved this new indication.[19]

27. On March 20, 2019, Novo announced the submission of NDA 213051 to the FDA for regulatory approval for oral semaglutide, under the brand name Rybelsus, the first once-daily glucagon-like peptide-1 receptor agonist for blood sugar control and cardiovascular risk reduction in adults with type 2 diabetes.[20] On September 20, 2019, the FDA approved NDA 213051.[21]

28. 120. On March 20, 2019, Novo submitted NDA 213051, requesting that the FDA grant it approval to market and sell Rybelsus (oral semaglutide) in both 7 mg and 14 mg oral doses in the United States as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus.[22]

29. 121. On December 10, 2019, Novo submitted a supplemental new drug application (NDA 213051/S-001) for Rybelsus (semaglutide) asking "for the addition of efficacy and safety information to the prescribing information based on clinical data from the PIONEER 6 cardiovascular outcomes trial entitled, 'A trial investigating the cardiovascular safety of oral

---

[18] https://www.prnewswire.com/news-releases/novo-nordisk-files-for-us-fda-approval-of-oral-semaglutide-for-blood-sugar-control-and-cardiovascular-risk-reduction-in-adults-with-type-2-diabetes-300815668.html (last visited on Sept. 17, 2023).
[19] https://www.accessdata.fda.gov/Ozempicatfda_docs/appletter/2020/209637Orig1s003ltr.pdf (last visited Sept. 17, 2023).
[20] Novo Nordisk files for US FDA approval of oral semaglutide for blood sugar control and cardiovascular risk reduction in adults with type 2 diabetes, Cision PR Newswire (Mar. 20, 2019), available at https://www.prnewswire.com/news-releases/novo-nordisk-files-for-us-fda-approval- of-oral-semaglutide-for-blood-sugar-control-and-cardiovascular-risk-reduction-in-adults-with- type-2-diabetes-300815668.html.
[21] FDA Approval Letter for NDA 213051 (Rybelsus), available at https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2019/213051Orig1s000ltr.pdf.
[22] Clinical Review for NDA 213051 (Rybelsus), available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2019/213051Orig1s000MedR.pdf (last visited 9/22/23).

semaglutide in subjects with type 2 diabetes.'"121 On January 16, 2020, the FDA approved NDA 213051/S-001.[23]

30. By March of 2021, Defendant had completed the clinical trial studying semaglutide for weight loss, and its results were published March 18, 2021.[24]

31. In addition to the results, the published study, which was funded by Defendant, argued: "Obesity is a chronic disease and global public health challenge."[25]

32. Then, on May 28, 2021, Defendant submitted another sNDA requesting approval for a higher, 2 mg dose of Ozempic injection. On March 28, 2022, the FDA approved this request.[26]

33. In its press release, Defendant represented Ozempic as having "proven safety and efficacy" and Defendant continued to advertise that "it can help many patients lose some weight."[27] As with its prior press releases, Defendant disclosed Important Safety Information and provided links to the Medication Guide and Prescribing Information. However, severe gastrointestinal events, including gastroparesis and gastroenteritis, were not identified as risks. Nor was there any disclosure about risks of vision loss, including NAION.

34. On July 15, 2022, Novo submitted a supplemental new drug application (NDA 123051/S-012) for Rybelsus to remove the "Limitation of Use" statement "Not recommended as first-line therapy for patients inadequately controlled on diet and exercise" in the "Prescribing Information and Medication Guide" ("PI"). The following updates were also made to the PI

---

[23] FDA Approval Letter for NDA 123051/S-011 (Rybelsus) available at https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2022/213051Orig1s011ltr.pdf.
[24] https://www.nejm.org/doi/full/10.1056/NEJMoa2032183 (last visited Sept. 17, 2023)
[25] *Id.*
[26] https://www.accessdata.fda.gov/Ozempicatfda_docs/appletter/2022/209637Orig1s009ltr.pdf (last visited Sept. 17, 2023).
[27] https://www.prnewswire.com/news-releases/novo-nordisk-receives-fda-approval-of-higher-dose-ozempic-2-mg-providing-increased-glycemic-control-for-adults-with-type-2-diabetes-301512209.html (last visited Sept. 17, 2023).

information: a) addition of Pancreatitis and Diabetic Retinopathy Complications to the Other Adverse Reactions subsection in section 6.1, Clinical Trials Experience; b) updating the Immunogenicity section and moving it from section 6.2 to section 12.6; c) adding "Gastrointestinal: ileus" to section 6.2, Postmarketing Experience; d) revising section 7.1, Concomitant Use with an Insulin Secretagogue (e.g., Sulfonylurea) or with insulin; and e) other minor grammatical changes. The FDA approved NDA 123051/S-012 on January 12, 2023.[28]

35. On January 12, 2023, Novo announced the FDA's approval of NDA 123051/S-012 for the label update described above. In the press release, Novo emphasized that "Rybelsus has been prescribed to hundreds of thousands of patients to help improve glycemic control[,]" and they disclosed Important Safety Information about Rybelsus and provided links to its Medication Guide and Prescribing Information, gastroparesis was not warned of as a side effect or risk.[29]

36. On September 22, 2023, Novo Nordisk added "ileus" under Section 6-3 Postmarketing Experience of the Prescribing Information ("PI" or "label") in a revised Ozempic label.

37. The new label listed ileus as an adverse reaction reported during post-approval use of semaglutide, the active ingredient in Ozempic.[30]

---

[28] Novo Nordisk announces FDA approval of label update for Rybelsus® (semaglutide) allowing use as a first-line option for adults with type 2 diabetes, Cision PR Newswire (Jan. 12, 2023), available at https://www.prnewswire.com/news-releases/novo-nordisk-announces-fda-approval-of-label-update-for-rybelsus-semaglutide-allowing-use-as-a-first-line-option-for-adults-with-type-2-diabetes-301720965.html.

[29] Novo Nordisk, Novo Nordisk announces FDA approval of label update for Rybelsus® (semaglutide) allowing use as a first-line option for adults with type 2 diabetes (Jan. 12, 2023), available at https://www.novonordisk-us.com/media/news-archive/news-details.html?id=154651.

[30] Ozempic Label (dated 9/22/23), available at https://www.accessdata.fda.gov/drugsatfda_docs/label/2023/209637s0202s0211bl.pdf

38. On September 6, 2024, the FDA notified Novo Nordisk of new safety information that it determined should be included in the labeling for GLP-1 RAs pertaining to the risk of pulmonary aspiration during general anesthesia or deep sedation.

39. On October 4, 2024, Novo Nordisk submitted a supplemental new drug application (sNDA 209637/S-032) and amendments for Ozempic incorporating the FDA's required safety modifications to the label.

40. On November 1, 2024, the FDA provided supplemental approval for sNDA 209637/S-032.[31]

41. No version of the Ozempic label has warned patients or their doctors that taking Ozempic may cause NAION or result in permanent vision loss.

42. No version of the Rybelsus label has warned patients or their doctors that taking Rybelsus may cause NAION or result in permanent vision loss.

## II. Defendant Creates a Market: Millions Spent on Marketing and Promotion Create a Media Frenzy and Mega Seller

43. Novo Nordisk was not permitted to market Ozempic for weight loss without FDA approval for that specific indication,[32] but before Ozempic ever received separate approval for treatment of wight loss, Novo Nordisk had already begun mentioning weight loss in its Ozempic commercials.[33]

---

[31] FDA Supplement Approval Letter for NDA 209637/S-032 (Ozempic), available at https://www.accessdatafda.gov/drugsatfda__docs/appletter/2024/209637Orig1s)32ltr.pdf

[32] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited Sept. 18, 2023).

[33] *Id.*

44. On July 30, 2018, Novo Nordisk launched its first television ad for Ozempic to the tune of the 1970s hit pop song “Magic” by Pilot, wherein Novo Nordisk advertised that “adults lost on average up to 14 pounds” when taking Ozempic.[34]

45. Over the next five years, Novo Nordisk spent $884,000,000 running television ads




in the United States to promote its semaglutides, Ozempic, Wegovy, and its lesser known GLP-1 agonists, Rybelsus, with most advertisements allocated towards Ozempic.[35]

46. Defendant also employed sophisticated use of social media to market Ozempic.

47. On TikTok, the hashtag #Ozempic had 273 million views as of November 22, 2022,[36] and currently has over 1.2 billion views.[37]

48. The hashtag #ozempicjourney has 199.5 million views, as of September 9, 2023,

[34] *Id.*
[35] https://medwatch.com/News/Pharma___Biotech/article15680727.ece (last visited Sept. 18, 2023).
[36] https://www.nytimes.com/2022/11/22/well/ozempic-diabetes-weight-loss.html (last visited Sept. 18, 2023).
[37] https://www.tiktok.com/tag/ozempic (last visited on August 1, 2023).

on TikTok.

49. Novo Nordisk partnered directly with Meta and Instagram to run marketing campaigns. One diabetes marketing campaign achieved a dramatic 28% direct engagement rate with their polls.[38] This was a lauded result presented in a case study by Meta.

50. On July 10, 2023, a global media company declared Ozempic as “2023’s buzziest drug” and one of the “Hottest Brands, disrupting U.S. culture and industry.”[39]

51. Novo Nordisk reportedly spent approximately one hundred million dollars advertising Ozempic last year.[40] Ozempic ranked as the sixth most advertised prescription drug brand in 2022, with a U.S. measured media spend of $181 million, according to Vivvix spending data and Pathmatics paid social data as reported in Ad Age Leading National Advertisers 2023.[41]

52. In 2023, over $491 million was spent advertising “diabesity” drugs, including Ozempic and Wegovy.[42]

53. Jimmy Kimmel joked about Ozempic at the Oscars.[43]

54. Howard Stern has joked and discussed Ozempic.[44] Interestingly, Stern notes that the “catchy” theme song “distracts” the listener from actually hearing any of the listed side effects.[45]

---

[38] https://business.instagram.com/success/novo-nordisk (last visited Sept. 17, 2023).
[39] https://adage.com/article/special-report-hottest-brands/ozempic-hottest-brands-most-popular-marketing-2023/2500571 (last visited on Sept. 17, 2023).
[40] https://www.newyorker.com/magazine/2023/03/27/will-the-ozempic-era-change-how-we-think-about-being-fat-and-being-thin (last visited Sept. 17, 2023).
[41] https://adage.com/article/special-report-hottest-brands/ozempic-hottest-brands-most-popular-marketing-2023/2500571?utm_source=exchange&utm_medium=email&utm_campaign=t5687390
[42] https://www.mmm-online.com/home/channel/spending-on-ozempic-wegovy-surges/
[43] https://www.usatoday.com/story/life/health-wellness/2023/03/13/ozempic-sweeping-hollywood-celebrities-weight-loss/11428801002/ (last accessed Sept. 17, 2023).
[44] https://www.youtube.com/watch?v=QD-nCQn1Ads (last visited on Sept. 17, 2023).
[45] *Id.*

55. Novo Nordisk has spent millions of dollars delivering their message to physicians, healthcare providers, and consumers.

56. For example, Novo Nordisk spent over $33,000,000 in 2022 on traditional physician marketing and detailing according to Open Payments Data. [46]

57. In sum, Novo Nordisk promoted the safety, efficacy, and sale of Ozempic in the United States on its websites, in press releases, through in-person presentations, through the drug's label, in print materials, on social media, advocacy groups, lobbying groups, celebrity partnerships, telehealth partnerships, key opinion leaders, and through other public outlets.

58. However, throughout its marketing, Defendant failed to disclose the true serious side effects of Ozempic, including but not limited to hospitalization and death.

## III. Marketing Works: Novo Nordisk's Rampant Promotion Result in Thousands of Prescriptions and Billions in Sales

59. As a result of Novo Nordisk's all-encompassing advertising and promotion efforts, Rybelsus is widely prescribed throughout the United States.

60. As of August 10, 2023, Novo Nordisk reported that in the first six months of 2023 sales of Ozempic jumped 50% to more than $3.7 billion.[47]

61. In July of 2021, doctors in the US wrote 62,000 prescriptions a week for Ozempic.[48]

62. It has been reported that the huge demand created by extensive marketing has led to rampant off-label usage and "gaming" the system to allow for insurance coverage.[49]

---

[46] https://openpaymentsdata.cms.gov/company/100000000144 (last visited Sept. 18, 2023)
[47] https://www.cnbc.com/2023/09/09/big-pharma-blockbuster-obesity-drug-battle-is-headed-for-100-billion.html#:~:text=Novo%20traded%20earnings%20jabs%20with,to%20more%20than%20%243.7%20billion. (last visited Sept. 18, 2023).
[48] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited on Sept. 18, 2023).
[49] *Id.*

63. In June 2023, it was reported that new prescriptions for Ozempic had surged by 140 percent from the prior year.[50]

64. This surge has reshaped Denmark's economy as the country has reaped huge profits from the sale of the drug, which is now solely responsible for the country's economic growth.[51]

65. Ozempic has become so popular, Novo Nordisk has recently limited shipment to the US and paused advertising while it addresses shortages.[52]

## IV. Defendant has long known that Ozempic is a powerful, dangerous drugs.

66. As detailed below, Defendant knew from both pre-market and post-market research and analytics that Ozempic could cause malnutrition, cyclical vomiting, gastroparesis, gastroenteritis, intestinal obstruction/blockage, ileus, esophageal and bowel injury, DVT and associated pulmonary embolism, gallbladder problems necessitating surgery, and intraoperative aspiration.

67. Novo Nordisk has repeatedly failed to warn about the known dangerous side effects of Ozempic. This includes malnutrition, cyclical vomiting, gastroparesis, gastroenteritis, intestinal obstruction/blockage, ileus, esophageal and bowel injury, DVT and associated pulmonary embolism, gallbladder problems necessitating surgery, and intraoperative aspiration. All of these conditions can, and have, lead to hospitalization and/or death in patients across America.

---

[50] https://www.washingtonpost.com/business/2023/06/11/weight-loss-ozempic-wegovy-insurance/ (last visited on 8/1/23).

[51] https://www.nytimes.com/2023/08/28/business/denmark-ozempic-wegovy.html?action=click&pgtype=Article&state=default&module=styln-weight-loss-drugs&variant=show&region=MAIN_CONTENT_1&block=storyline_top_links_recirc (last visited on Sept. 18, 2023).

[52] https://www.theatlantic.com/health/archive/2023/05/ozempic-teen-obesity-treatment-health-promises-risks/674204/ (last visited on Sept. 18, 2023).

68. Some doctors estimate that as many as 10% of patients discontinue use of these drugs due to the severity of side effects.[53]

69. Thousands of adverse event reports have been filed by the public with the FDA Adverse Event Reporting System. As of June 2022, the FDA has posted an alert that Ozempic has potential safety signals for intestinal blockage.[54]

70. On September 22, 2023, FDA updated the label for Ozempic to include "ileus," the medical term for blocked intestines.[55]

71. Wegovy, chemically identical to Ozempic, already carried a warning on ileus.

72. As early as 2014, Defendant knew that Saxenda (liraglutide), Ozempic's predecessor, caused serious side effects and warned the end user of same.[56]

73. As early as 2019, Defendant knew that Rybelsus (Semaglutide), Ozempic's predecessor, caused serious side effects and warned the end user of same.

## V. Development of NAION and Its Sequela

74. Non-arteritic anterior ischemic optic neuropathy (NAION) is a medical condition involving damage to the optic nerve resulting in the loss of vision.

---

[53] https://www.cbsnews.com/news/ozempic-side-effects-weight-loss-drugs-wegovy-mounjaro-doctors-warn/ (last visited Sept. 18, 2023)
[54] https://www.fda.gov/drugs/questions-and-answers-fdas-adverse-event-reporting-system-faers/april-june-2022-potential-signals-serious-risksnew-safety-information-identified-fda-adverse-event (last visited Sept. 18, 2023)
[55] https://www.accessdata.fda.gov/scripts/cder/safetylabelingchanges/index.cfm?event=searchdetail.page&DrugNameID=2183; https://www.healthline.com/health-news/fda-updates-ozempic-label-to-include-blocked-intestines-as-potential-side-effect#:~:text=Ozempic%20Label%20Updated%20to%20Include%20Blocked%20Intestines%20as%20Potential%20Side%20Effect&text=The%20FDA%20is%20warning%20patients,serious%20and%20potentially%20fatal%20condition.
[56] https://www.accessdata.fda.gov/drugsatfda_docs/label/2014/206321orig1s000lbl.pdf (last visited on Sept. 18, 2023).

75. NAION is irreversible and permanent.

76. NAION falls within the category of an eye stroke.

77. NAION is untreatable and can lead to permanent blindness.

78. While the precise cause of NAION is unknown, the general belief amongst the medical community is that the condition is caused by insufficient blood supply or ischemia to the optic nerve.

79. "[T]ransient hypoperfusion of the short posterior ciliary arteries causes acute ischemia to the optic nerve head (ONH), resulting in axonal swelling. This swelling compromises the axoplas-mic flow, which subsequently increases the axonal swelling, contributing to the compression of ONH microcirculation, exacerbating the ischemia."

80. Anterior ischemic optic neuropathy (AION) involves the 1mm segment of the optic nerve head, also known as the optic disc, and results in visible disc swelling.

81. Typically, NAION patients present with acute, painless vision loss in one eye that is often described as blurry or cloudy while 8-12% of patients may have accompanying pain such as a headache or periocular pain.

82. The vision loss may occur over hours to days, but generally NAION patients notice vision loss or even total blindness upon waking in the morning.

83. After glaucoma, NAION is the second most common cause of blindness due to optic nerve damage.

84. Some NAION patients lose complete vision with no recovery in affected eye(s).

85. Reduced or loss of vision has a detrimental impact on a person's day-to-day life. Many NAION patients cannot drive or have driving restrictions, cannot read or have trouble reading, and may be unable to continue in their line of employment. Being blind in one eye, and

certainly both eyes, results in bumps and falls and injuries related to the unseen impacts and accidents.

86. Patients with NAION suffer from blurred or darkened vision obstructing their field of view, as well as loss of color vision and loss of contrast in vision.[57]

87. About 15% of patients who have NAION in one eye eventually develop it in their other eye.[58]

88. GLP-1 RAs are treated as a class by the FDA, and the class of drugs shares a similar mechanism of action, similar physiologic effects, and similar chemical structure.

89. It has been known since at least 2016 that the human eye contains GLP-1 receptors.[59]

90. Defendant knew or should have known of the causal association between the use of Ozempic and the risk of developing NAION and its sequelae, but they ignored it.

91. The FDA's Adverse Events Reporting System (FAERS) shows multiple reports of "Optic Ischemic Neuropathy" reported in connection with the use of GLP-1 RAs.

92. The earliest reported Optic Ischemic Neuropathy event associated with any GLP-1 RA occurred in 2012, and the earliest associated with semaglutide specifically was in 2019.[60]

---

[57] *Ischemic Optic Neuropathy,* Cleveland Clinic, (last reviewed 6/30/2024), available at https://my.clevelandclinic.org/health/diseaes/ischemic-optic-neuropathy

[58] *Id.*

[59] 47 Hernández C et al, Topical Administration of GLP-1 Receptor Agonists Prevents Retinal Neurodegeneration in Experimental Diabetes, DIABETES 2016 Jan;65(1):172-87. doi: 10.2337/db15-0443. Epub 2015 Sep 17. PMID: 26384381.

[60] The FAERS database is accessible online at https://www.fda.gov/drugs/questions-and-answers-fdas-adverse-event-reporting-system-faers/fda-adverse-event-reporting-system-faers-public-dashboard.

93. A meta-analysis of all clinical trials of GLP-1RA drugs, including Novo Nordisk's own clinical trials, found a non-statistically significant increased risk of optic ischemic neuropathy.[61]

94. The authors note that optic ischemic neuropathy is rare and may have been underreported in clinical trials, leading to a lower estimated risk.[62]

95. The overall rate of optic ischemic neuropathy was higher in the treatment group than the control group: 5.6 and 3.0 cases per 100,000 patient-years, respectively. The authors also note that "inappropriate use of drugs for inducing weight loss in moderately overweight patients with low cardiovascular risk could be associated with rare, but severe, adverse effects, possibly including NAION.[63]

96. A Novo Nordisk spokesperson acknowledged that cases of NAION, which leads to severe and irreversible vision loss, were identified in Novo Nordisk's clinical trials.[64]

97. Defendant knew or should have known of the risk of NAION with use of Ozempic.

98. Defendant conducts clinical trials and has access to case reports and medical literature that provides it with superior knowledge compared to the general public as to potential risks of its medications.

---

[61] Silverii GA et al, Glucagon-like peptide 1 (GLP1) receptor agonists and risk for ischemic optic neuropathy. A meta-analysis of randomised controlled trials, Diabetes Obes Metab, 2024 (available as a pre-print manuscript as of November 20, 2024), https://dom-pubs.pericles-prod.literatumonline.com/doi/10.1111/dom.16076.

[62] Id.

[63] Id.

[64] Kevin Dunleavey, After studies flag possible link between Novo's Ozempic and rare eye disorder, Danish agency calls for probe, Fierce Pharma, (December 17, 2024), available at https://www.fiercepharma.com/pharma/novo-nordisk-faces-new-reports-suggesting-link-between-ozempic-and-blindness (last visited 12/18/2024); See also Naomi Kresge, Ozempic Link to Rare Vision Loss Risk Confirmed in Study, Bloomberg, (December 13, 2024), available at https://www.bloomberg.com/news/articles/2024-12-13/ozempic-link-to-rare-vision-loss-risk-confirmed-in-large-trial?leadSource=uverify%20wall (last visited 12/18/2024).

99. For example, a clinical trial entitled "A Research Study to Compare Two Doses of Semaglutide Taken Once Weekly in People With Type 2 Diabetes (SUSTAIN FORTE)" with results first submitted in August 2021, involved a participant who developed optic ischemic neuropathy which was categorized as a serious adverse event.[65]

100. The event occurred within the Semaglutide 2.0 mg dosage group, which included 479 participants, which is significant given the low background incidence of NAION.[66]

101. Clinical observations by astute neuro-ophthalmologists at the Harvard affiliated Massachusetts Eye and Ear ("Mass Eye and Ear") who noted a surge of NAION cases amongst patients on Ozempic led them to conduct a retrospective, matched cohort study of neuro-ophthalmic patients at Mass Eye and Ear, Boston.

102. The study "Risk of Nonarteric Anterior Ischemic Optic Neuropathy in Patients Prescribed Semaglutide", authored by Hathaway *et al.*, involved patients examined in the neuro-ophthalmology clinic between December 1, 2017, and November 30, 2023, and consisted of 17,298 patients, including 16,827 patients over the age of 12, 710 of which had type 2 diabetes (T2D), and 979 were overweight or obese.[67]

103. Of the 710 T2D patients, 194 patients were prescribed semaglutide and 516 were prescribed other non-GLP-1 RA antidiabetic medications.[68]

---

[65] A Research Study to Compare Two Doses of Semaglutide Taken Once Weekly in People With Type 2 Diabetes (SUSTAIN FORTE). ClinicalTrials.gov identifier: NCT03989232. Updated February 13, 2023. Accessed February 18, 2025.
[66] *Id.*
[67] Hathaway JT, Shah MP, Hathaway DB, et al. Risk of Nonarteritic Anterior Ischemic Optic Neuropathy in Patients Prescribed Semaglutide. JAMA Ophthalmol. 2024;142(8):732–739. doi:10.1001/jamaophthalmol.2024.2296
[68] *Id.*

104. Of the 979 overweight/obese patients, 361 were prescribed semaglutide and 618 were prescribed other non-GLP-1 RA anti-obesity medications.[69]

105. Within the T2D study population, NAION occurred in 17 patients in the semaglutide cohort vs. 6 in the non-GLP-1 RA cohort. The Kaplan-Meier survival analysis at 36 months showed a cumulative incidence of NAION of 8.9% (95% CI, 4.5%-13.1%) for the semaglutide cohort vs 1.8% (95% CI, 0%-3.5%) for the nonsemaglutide cohort and the Cox proportional hazards regression model showed a higher NAION risk in the semaglutide cohort vs the nonsemaglutide cohort (HR, 4.28; 95% CI, 1.62-11.29; $P < .001$; concordance coefficient = 0.84).[70]

106. Within the overweight/obese cohort, NAION occurred in 20 patients in the semaglutide cohort vs. 3 in the non-GLP-1 RA cohort. The Kaplan-Meier survival analysis at 36 months showed a cumulative incidence of NAION of 6.7% (95% CI, 3.6%-9.7%) for the semaglutide cohort vs 0.8% (95% CI, 0%-1.8%) for the nonsemaglutide cohort and the Cox proportional hazards regression model showed a higher NAION risk in the semaglutide cohort vs the nonsemaglutide cohort (HR, 7.64; 95% CI, 2.21-26.36; P < .001; concordance correlation coefficient = 0.86).[71]

107. The primary outcome of the Hathaway *et al.* study is that use of Ozempic is associated with an increased risk of NAION. "The relatively high HRs (4.28 and 7.64 for our T2D and overweight or obese cohorts, respectively) identified by our Cox regression analyses reveal a

---

[69] *Id.*
[70] *Id.*
[71] *Id.*

substantially increased risk of NAION among individuals prescribed semaglutide relative to those prescribed other medications to treat T2D and obesity or overweight."[72]

108. Acknowledging the pathogenesis or cause of NAION remains unknown. The authors did not determine the mechanism in which semaglutide causes NAION, however, it was hypothesized that expression of the GLP-1 receptor in the optic nerve and GLP-1 RA–induced enhanced sympathetic nervous system activity might influence optic nerve head perfusion and potentially increase the risk of NAION.[73]

109. A meta-analysis of all clinical trials of GLP-1 receptor drugs, including Defendant's own clinical trials, found a non-statistically increased risk of optic ischemic neuropathy.[74] Because optic ischemic neuropathy is rare, the authors note there may have been underreporting in the clinical trials, leading to a lower estimated risk.[75] However, the study concluded the overall rate of optic ischemic neuropathy was higher in the GLP1-RA group compared to the placebo group: 5.6 and 3.0 cases per 100,000 patient-years, respectively which is nearly a doubling of the risk.[76]

110. On December 11, 2024, a pre-print of an article entitled "Use of semaglutide and risk of non-arteritic anterior ischemic optic neuropathy: A Danish- Norwegian cohort study", found an association between use of semaglutide for type 2 diabetes.[77]

111. This cohort study compared the risk of NAION among individuals with type 2

---

[72] *Id.*
[73] *Id.*
[74] Silverii GA, Pala L, Cresci B, Mannucci E. Glucagon-like peptide 1 (GLP1) receptor agonists and risk for ischemic optic neuropathy: A meta-analysis of randomised controlled trials. *Diabetes Obes Metab*. 2025; 27(2): 1005-1009. doi:10.1111/dom.16076
[75] *Id.*
[76] *Id.*
[77] Simonsen E, Lund LC, Ernst MT, et al. Use of semaglutide and risk of non-arteritic anterior ischemic optic neuropathy: A Danish–Norwegian cohort study. Published online December 11, 2024. doi:10.1101/2024.12.09.24318574

diabetes using semaglutide compared to those using sodium-glucose co-transporter 2 inhibitors (SGLT-2s), another diabetes medication.[78] The authors concluded there is "an association between use of semaglutide for type 2 diabetes and risk of NAION, with a more than two-fold increased hazard ratio."[79]

112. In a registry-based prospective cohort study identifying 424,152 patients diagnosed with type 2 diabetes in Denmark between December 1, 2018, and December 31, 2023,[80] 106,454 of these patients were exposed to semaglutide and 67 developed NAION.[81]

113. "Exposure to once weekly semaglutide was followed by 67 events of NAION during 294,395 years of observation as compared to 151 events during the 1,620,725 years of observation for non-exposed."[82]

114. The study concluded use of semaglutide "more than doubles the risk of NAION, even when multiple other factors have been taken into account."[83]

115. Interestingly, the study also observed that "after the introduction of once-weekly semaglutide in Denmark in November 2018, the annual number of first-time NAION episodes reached an all-time high for the years 2019-2023.[84]

116. Due to the findings of the two studies out of Denmark, as of January 17, 2025, the Pharmacovigilance Risk Assessment Committee (PRAC) of the Danish Medicines Agency has

---

[78] *Id.*
[79] *Id.*
[80] Grauslund J, Taha AA, Molander LD, et al. Once-weekly semaglutide doubles the five-year risk of nonarteritic anterior ischemic optic neuropathy in a Danish cohort of 424,152 persons with type 2 diabetes. *Intl. Journal of Retina and Vitreous*. 2024;10(1):97. doi:10.1186/s40942-024-00620-x
[81] *Id.*
[82] *Id.*
[83] *Id.*
[84] *Id.*

required Novo Nordisk to review and submit available data related to semaglutide and NAION. The PRAC will review and determine if a label change is warranted or if other risk minimization efforts should be pursued.[85]

117. In response, Novo Nordisk has acknowledged cases of NAION were identified within their clinical trials.[86]

118. A recent case series published by Katz *et al.*, "Ophthalmic Complications Associated With the Antidiabetic Drugs Semaglutide and Tirzepatide," also examined nine patients taking GLP1-RA medications who had experienced ophthalmologic complications. Of the nine patients, seven developed NAION.[87]

119. The Katz article included a report of a woman with type 2 diabetes taking insulin and semaglutide and evidence of positive challenge and rechallenge with semaglutide.[88]

120. The morning after the patient's first injection of semaglutide, she experienced painful vision loss in his left eye and was diagnosed with bilateral optic nerve swelling and the initial impression was optic neuritis with poor recovery. She discontinued the medication only to start it again approximately two months later after which she experienced painful vision loss in his right eye. Imaging performed on the right eye was consistent with NAION.

121. A study published on April 7, 2025, analyzing FDA Adverse Event reports indicates increased reports of vision impairment linked to semaglutide use. Compared to other

[85]https://laegemiddelstyrelsen.dk/en/news/2024/suspicion-of-rare-eye-condition-from-ozempic-use-to-be-investigated-further/
[86]https://www.fiercepharma.com/pharma/novo-nordisk-faces-new-reports-suggesting-link-between-ozempic-and-blindness
[87] Katz BJ, Lee MS, Lincoff NS, et al. Ophthalmic Complications Associated With the Antidiabetic Drugs Semaglutide and Tirzepatide. *JAMA Ophthalmol*. Published online January 30, 2025. doi:10.1001/jamaophthalmol.2024.6058
[88] *Id.*

diabetes and weight loss medications, users of semaglutide showed "significantly higher" reports of vision impairment.[89]

122. Despite the growing number of articles, reports, and an investigation by PRAC of the Danish Medicines Agency, Defendant still provides no warnings about the dangerous side effect of NAION in conjunction with use of Ozempic.

**VI. Defendant's Continuing Failure to Disclose the Risk of NAION and its Sequala**

123. According to the Drugs@FDA website, the label for Ozempic has been updated on at least thirteen (13) occasions since 2017, with the most recent update on January 28, 2025.[90] Despite the fact there are at least fourteen (14) iterations of the Ozempic label, Defendant's labels have not contained any warning or any information whatsoever on the increased propensity of Ozempic to cause NAION and permanent vision loss as suffered by Plaintiff.

124. According to the Drugs@FDA website, the label for Ozempic has been updated on at least nine (9) occasions since 2021, with the most recent update on November 27, 2024.[91] Despite the fact that there are at least ten (10) iterations of the Ozempic label, Defendant's labels have not contained any warning or any information whatsoever on the increased propensity of Ozempic to cause NAION and permanent vision loss as suffered by Plaintiff.

---

[89] Massy, et al. Increased vision impairment reports linked to semaglutide: analysis of FDA adverse event data, BMC Medicine (2025) 23:203, available at https://bmcmedicine.biomedcentral.com/articles/10.1186/s12916-025-04031-z.

[90] *See* Drugs@FDA: FDA-Approved Drugs, Ozempic, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=209637 (last visited February 19, 2025).

[91] https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=BasicSearch.process (last visited June 12, 2025)

125. On June 6, 2025 the European Medicines Agency (EMA) recommended that the product information for semaglutide medicines including Ozempic, Wegovy, Rybelsus include NAION as a side effect.[92]

126. To date, the Ozempic warning label is still devoid of any mention of NAION.

127. To date, the Wegovy warning label is still devoid of any mention of NAION.

128. To date, the Rybelsus warning label is still devoid of any mention of NAION.

129. Furthermore, Defendant has failed to take any steps to otherwise warn the medical community, particularly physicians within the ophthalmologic community, to encourage a baseline eye exam prior to starting Ozempic, Rybelsus, and/or Wegovy, monitoring of patients while on the medication, advising patients to cease use of the medication if they develop symptoms consistent with NAION, or after the fact as to not risk the potential for injury in the other eye.

130. Nothing was or is stopping Defendant from adding a warning regarding the risk of NAION. Defendant could have at any time made "moderate changes" to the labels.

131. Specifically, Defendant could have filed a "Changes Being Effected" ("CBE") supplement under Section 314.70(c) of the FDCA to make "moderate changes" to Ozempic, Rybelsus, and/or Wegovy's label without any prior FDA approval.

132. Examples of moderate label changes that can be made via a CBE supplement explicitly include changes "to reflect newly acquired information" in order to "add or strengthen a contraindication, warning, precaution, or adverse reaction." By definition and by regulation, such changes to add a warning based on newly acquired information—such as that imparted by newly

[92] https://www.ema.europa.eu/en/news/prac-concludes-eye-condition-naion-very-rare-side-effect-semaglutide-medicines-ozempic-rybelsus-wegovy

emerging literature like the litany of studies cited above—are considered a "moderate change." § 340.70(c)(6)(iii).

133. On July 3, 2024, the Journal of the American Medical Association ("JAMA") – Ophthalmology published a study suggesting an association between semaglutide and NAION. The study, which evaluated data from December of 2017 through November of 2023, showed that patients with type 2 diabetes taking semaglutide had a more than three times greater risk of developing NAION than those taking non-GLP-1 RA medications. For patients taking semaglutide for overweight/obesity indications, the risk of developing NAION was nearly seven times greater than non-GLP-1 RA medications.[93]

134. The JAMA study referenced a potential causal mechanism, proposing that "expression of the GLP-1 receptor in the human optic nerve and GLP-1 RA induced enhanced sympathetic nervous system activity might influence optic nerve head perfusion and potentially increase the risk of NAION."[94]

135. The FDA's Adverse Events Reporting System (FAERS) shows multiple reports of "Optic Ischaemic Neuropathy" reported in connection with use of GLP-1RAs. The earliest

---

[93] Specifically, the study showed a cumulative incidence of NAION of 8.9% in type 2 diabetes patients taking semaglutide, compared to only 1.8% for patients not taking GLP-1RA medications, with a hazard ratio of 4.28. For overweight/obese patients, the cumulative incidence of NAION was 6.7% for patients taking semaglutide, compared to only 0.8% for those not taking GLP-1RAs, with a hazard ratio of 7.64. Jimena Tatiana Hathaway, et al., Risk of Nonarteritic Anterior Ischemic Optic Neuropathy in Patients Prescribed Semaglutide, JAMA OPHTHALMOLOGY 2024;142(8):732-739 (published online July 3, 2024), available at https://jamanetwork.com/journals/jamaophthalmology/fullarticle/2820255 (last visited 12/17/2024).

[94] *Id.*

reported Optic Ischaemic Neuropathy event associated with any GLP-1RA occurred in 2012, and the earliest associated with semaglutide specifically was in 2019.[95]

**PARTY PLAINTIFF**

136. Plaintiff LORNE HARARI is a resident of the state of Florida and is currently fifty (50) years old.

137. On or around April 2024, he consulted with Zarnaz Bagheri,MD to discuss options for treatment of his diabetes type 2.

138. As a result of his appointment, Zarnaz Bagheri, MD prescribed LORNE HARARI with with Rybelsus 7mg tablets.

139. Approximately in July 2024, Plaintiff began experiencing vision issues. He consulted an ophthalmologist where he was diagnosed with non-arteritic anterior ischemic optic neuropathy in the right eye on July 10, 2024.

140. At all times material to the above, the Rybelsus label failed to adequately warn LORNE HARARI and his medical providers of the true risks of taking Rybelsus.

141. At all times material to the above, the marketing and advertising failed to adequately warn LORNE HARARI and his medical providers of the true risks of taking Rybelsus.

142. His life is forever changed because of his usage of Rybelsus.

143. LORNE HARARI will never see clearly again as a result of his usage of Rybelsus.

144. Defendant knew or should have known that use of semaglutide could lead to severe and debilitating injuries suffered by Plaintiff and numerous other patients.

[95] The FAERS database is accessible online at https://www.fda.gov/drugs/questions-and-answers-fdas-adverse-event-reporting-system-faers/fda-adverse-event-reporting-system-faers-public-dashboard.

145. Defendant continues to downplay the risk of NAION and has not changed or provided any warnings to the public and medical community.

146. Defendant's Rybelsus was at all times utilized and prescribed in a manner foreseeable to Defendant.

147. Plaintiff used Rybelsus, and did not misuse, or alter Rybelsus in an unforeseeable manner.

148. Through its affirmative misrepresentations and omissions, Defendant actively concealed from Plaintiff and his physicians the true and significant risks associated with this medication.

149. As a result of Defendant's actions, Plaintiff and his physicians were unaware, and could not have reasonably known or learned through reasonable diligence, that Plaintiff would be exposed to the risks identified in this Complaint and that those risks were the direct and proximate result of Defendant's conduct.

150. As a direct result of being prescribed and using Rybelsus, Plaintiff has been permanently and severely injured, having suffered serious consequences.

151. As a direct and proximate result of his Rybelsus use, Plaintiff suffered severe mental and physical pain and suffering and has sustained permanent injuries and emotional distress, loss of earnings, loss of ability to earn money and other economic losses including past and future medical expenses.

152. Plaintiff diligently investigated the potential cause of these injuries, but their relationship to Rybelsus was not discovered, and through reasonable care and diligence could not have been discovered, until a date within the applicable statute of limitations for filing Plaintiff's claims.

153. Had Plaintiff and/or Plaintiff's physicians known of the true risks of NAION associated with the use of Rybelsus, Plaintiff and/or Plaintiff's physicians would not have used the medication and would have chosen a different option for the treatment of his Type II diabetes.

154. Plaintiff's life is forever changed as a result of Defendant's actions and inactions.

**COUNT I**
**STRICT LIABILITY – FAILURE TO WARN**
**(Pursuant to Applicable Product Liability Law)**

155. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

156. At all relevant times, Defendant engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Rybelsus and placed these drugs into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendant.

157. Defendant, as the holder of the NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting adverse events, label changes, post-market surveillance and pharmacovigilance.

158. Defendant, as a manufacturer, distributer, and marketer of pharmaceutical drugs, is held to the level of knowledge of an expert in the field, and further, Defendant knew or should have known that warnings and other clinically relevant information and data which they distributed regarding the risks associated with the use of Rybelsus were inadequate.

159. Plaintiff did not have the same knowledge as Defendant and no adequate warning, other clinically relevant information, or data was communicated to Plaintiff or to Plaintiff's prescribing and treating physicians.

160. Defendant had a duty to provide adequate warnings and instructions for Rybelsus, to use reasonable care to design a product that is not unreasonably dangerous to users, and to adequately understand, test, and monitor their products.

161. Defendant had a continuing duty to provide consumers, including Plaintiff and Plaintiff's physicians, with warnings and other clinically relevant information and data regarding the risks and dangers associated with Rybelsus, as it became or could have become available to Defendant.

162. Defendant marketed, promoted, distributed and sold an unreasonably dangerous and defective prescription drugs, Rybelsus, to health care providers empowered to prescribe and dispense Rybelsus to consumers, including Plaintiff, without adequate warnings and other clinically relevant information and data. Through both omission and affirmative misstatements, Defendant misled and continues to mislead the medical community about the risk and benefit balance of Rybelsus, which resulted in permanent injuries to Plaintiff.

163. Defendant knew or should have known through testing, scientific knowledge, advances in the field, or otherwise, that Rybelsus created a risk of serious and potentially irreversible vision issues, sudden vision loss or blindness, severe optic nerve damage, and NAION in one or potentially both eyes.

164. Despite the fact that Defendant knew or should have known that Rybelsus caused unreasonable and dangerous side effects, it continues to promote and market Rybelsus without providing adequate clinically relevant information.

165. Defendant knew or should have known that consumers, Plaintiff, specifically, would foreseeably and needlessly suffer injury as a result of Defendant's failures.

166. The Rybelsus supplied to Plaintiff by Defendant was defective, unreasonably dangerous, and had inadequate warnings or instructions at the time it was sold. Defendant possessed knowledge and information confirming the defective and unreasonably dangerous nature of Rybelsus but, despite this knowledge and information, Defendant failed and neglected to issue adequate warnings that Rybelsus cause serious and potentially irreversible vision issues, optic nerve damage, and NAION. Defendant has yet to issue any warnings or recommendations that patients taking Rybelsus undergo ophthalmological monitoring.

167. Defendant's failure to provide adequate warnings or instructions rendered Rybelsus unreasonably dangerous in that it failed to perform as safely as an ordinary patient, prescriber, and/or other consumer would expect when used as intended and/or in a manner reasonably foreseeable by the Defendant, and in that the risk of danger outweighs the benefits.

168. Defendant continues to fail to provide adequate warnings to physicians, pharmacies, and consumers, including Plaintiff and Plaintiff's intermediary physicians.

169. Defendant failed to include adequate warnings and/or provide adequate clinically relevant information and data that would alert Plaintiff and Plaintiff's physicians to the dangerous risks of Rybelsus including, among other things, potentially irreversible vision issues such as NAION and optic nerve damage.

170. Defendant failed to provide adequate post-marketing warnings and instructions after Defendant knew or should have known of the significant risks of, among other things, potentially irreversible vision issues and optic nerve damage.

171. Defendant continued to aggressively promote and sell Rybelsus, even after they knew or should have known of the unreasonable risks of potentially irreversible vision issues and optic nerve damage from the drugs.

172. Defendant had an obligation to provide Plaintiff and Plaintiff's physicians with adequate clinically relevant information and data and warnings regarding the adverse health risks associated with exposure to Rybelsus, that there existed safer and or equally effective alternative drug products that do not pose this same risk.

173. By failing to adequately test and research harms associated with Rybelsus , and by failing to provide appropriate warnings and instructions about use, patients and the medical community, including prescribing doctors, were inadequately informed about the true risk-benefit profile of Rybelsus and were not sufficiently aware that serious and potentially irreversible vision issues and optic nerve damage might be associated with use of Rybelsus . Nor were the medical community, patients, patients' families, or regulators appropriately informed that serious and potentially irreversible vision issues and optic nerve damage might be a side effect of Rybelsus and should or could be reported as an adverse event.

174. The semaglutide products designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendant were defective due to inadequate post-marketing surveillance and/or warnings because, even after Defendant knew or should have known of the risks of severe and permanent vision loss and optic nerve injuries from using Rybelsus, Defendant failed to provide adequate warnings to users or consumers of the products, and continued to improperly advertise, market and/or promote .

175. Rybelsus is defective and unreasonably dangerous to Plaintiff and other consumers regardless of whether Defendant had exercised all possible care in their preparation and sale.

176. The foreseeable risk of serious and potentially irreversible vision issues and harm to the optic nerve caused by Rybelsus could have been reduced or avoided by Plaintiff, prescribers, and/or other consumers had Defendant provided reasonable instructions or warnings of these foreseeable risks of harm.

177. As a direct and proximate result of Defendant's conduct, including the inadequate warnings, lack of information, lack of adequate testing and research, and the defective and dangerous nature of Rybelsus , Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff respectfully request that Plaintiff be granted relief against Defendant, as contained in the Prayer For Relief.

## COUNT II

## STRICT LIABILITY – DESIGN DEFECT
**Pursuant to Applicable Product Liability Law**

178. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

179. At all relevant times, Defendant engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Rybelsus and placed these drugs into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendant.

180. Defendant, as the holder of NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting adverse events, label changes, post-market surveillance, and pharmacovigilance.

181. Defendant, as a manufacturer, designer, distributer, and marketer of pharmaceutical drugs, had a duty to design a product free from a defective condition that was unreasonably dangerous to the Plaintiff.

182. Rybelsus are designed in such a way that posed an unreasonable risk of permanent vision loss and optic nerve injuries and were kept on the market despite being in a defective condition.

183. Defendant knew or should have known the Rybelsus they developed, manufactured, labeled, marketed, sold, and/or promoted were defectively designed in that they posed a serious risk of severe and permanent vision and optic nerve injuries.

184. Defendant had a continuing duty to design a product that is not unreasonably dangerous to users and to adequately understand, test, and monitor their product.

185. Defendant sold, marketed and distributed products that are unreasonably dangerous for their normal, intended, and foreseeable use.

186. Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed Rybelsus, a defective product which created an unreasonable risk to the health of consumers, and Defendant is therefore strictly liable for the injuries sustained by Plaintiff.

187. The Rybelsus supplied to Plaintiff by Defendant was defective in design or formulation in that, when it left the hands of the manufacturer or supplier, it was in an unreasonably dangerous and a defective condition because it failed to perform as safely as an ordinary consumer

would expect when used as intended or in a manner reasonably foreseeable to Defendant, posing a risk of serious and potentially irreversible vision issues and optic nerve damage to Plaintiff and other consumers.

188. The Rybelsus taken by Plaintiff was expected to, and did, reach Plaintiff without substantial change in the condition in which it is sold.

189. The Rybelsus taken by Plaintiff was in a condition not contemplated by the Plaintiff in that it was unreasonably dangerous, posing a serious risk of permanent vision loss and optic nerve damage.

190. Rybelsus is a medication indicated for treatment of type 2 diabetes. Rybelsus in fact causes serious and potentially irreversible vision issues, severe optic nerve damage, sudden blindness, and NAION, in one or both eyes, harming Plaintiff and other consumers.

191. Plaintiff, ordinary consumers, and prescribers would not expect a diabetes drug designed, marketed, and labeled for weight loss and marketed for its supposed health benefits to cause irreversible vision issues and optic nerve damage.

192. The Rybelsus supplied to Plaintiff by Defendant was defective in design or formulation in that, when it left the hands of the manufacturer or supplier, it had not been adequately tested, was in an unreasonably dangerous and defective condition, and posed a risk of serious and potentially irreversible vision issues and optic nerve damage to Plaintiff and other consumers.

193. The Rybelsus supplied to Plaintiff by Defendant was defective in design or formulation in that its alleged benefits did not outweigh the risks of serious and potentially irreversible vision issues and optic nerve damage posed by the drug. In light of the utility of the

drug and the risk involved in its use, the design of Rybelsus makes the product unreasonably dangerous.

194. Rybelsus's design is more dangerous than a reasonably prudent consumer would expect when used in its intended or reasonably foreseeable manner. It was more dangerous than Plaintiff expected.

195. The intended or actual utility of Rybelsus is not of such benefit to justify the risk of optic nerve damage that may be irreversible and permanently disabling thereby rendering the product unreasonably dangerous.

196. The design defects render Rybelsus more dangerous than other drugs and therapies designed to treat type 2 diabetes and obesity and cause an unreasonable increased risk of injury, including, but not limited, to potentially irreversible vision issues and optic nerve damage.

197. Defendants knew or should have known through testing, scientific knowledge, advances in the field, or otherwise, that Rybelsus created a risk of serious and potentially irreversible vision issues, severe optic nerve damage, sudden blindness, and NAION in one or both eyes.

198. Rybelsus is defective and unreasonably dangerous to Plaintiff and other consumers in that, despite knowledge that Rybelsus use could result in vision issues, Defendant failed to adequately test or study the drugs, including but not limited to: pharmacokinetics and pharmacodynamics of the drugs, its effects on vision and the optic disc, the potential for inter-patient variability, and/or the potential for a safer effective dosing regimen.

199. Defendant acted unreasonably in its design of Rybelsus in that Defendant failed to adopt a safer design for the product that was practical, feasible, and otherwise a reasonable alternative design or formulation that would have prevented or substantially reduced the risk of harm without substantially impairing the usefulness, practicality, or desirability of the product.

200. Defendant knew or should have known that consumers, and Plaintiff specifically, would foreseeably and needlessly suffer injury as a result of Rybelsus's defective design.

201. Rybelsus is defective and unreasonably dangerous to Plaintiff and other consumers even if Defendant had exercised all possible care in the preparation and sale of these products.

202. As a direct and proximate result of Defendant's conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of Rybelsus, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff respectfully requests that Plaintiff be granted relief against Defendant, as contained in the Prayer For Relief.

## COUNT III
## <u>NEGLIGENT FAILURE TO WARN</u>

203. Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

204. At all relevant times, Defendant engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Rybelsus and placed these drugs into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendant.

205. Defendant, as the holder of the NDA, is responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

206. Rybelsus was expected to reach, and did reach, users and/or consumers, including Plaintiff, without substantial change in the defective and unreasonably dangerous condition in which it was sold or distributed.

207. Defendant owed Plaintiff and other Rybelsus users a duty to exercise reasonable care in marketing, advertising, promoting, distributing and/or selling Rybelsus.

208. At all times material, Rybelsus was used in a manner intended and/or foreseeable to Defendants.

209. A reasonable patient or consumer of Rybelsus would expect the drug to be free of significant defects.

210. Defendant knew or had reason to know of facts establishing that Rybelsus could cause NAION and failed to warn of the risk.

211. At all times relevant hereto, the defective nature of Rybelsus was known to Defendant, or reasonably and scientifically knowable to them, through appropriate research and testing by known methods, at the time they distributed, supplied, or sold Rybelsus, and not known to ordinary physicians who would be expected to prescribe the drug to their patients.

212. In disregard of its duty to timely warn consumers of health risks associated with Rybelsus, Defendant committed one or more of the following negligent acts or omissions:

a. Failing to properly and adequately warn and instruct Plaintiff and Plaintiff's treating physicians that Rybelsus was designed and/or manufactured in a way that it could cause injuries and damages, including permanent vision loss;

b. Failing to timely disclose to Plaintiff and Plaintiff's prescribing and treating physicians the risk of NAION;

c. Failing to timely warn Plaintiff and Plaintiff's physicians that a base line eye exam should be performed and monioring was necessary.

213. At all relevant times, the label for Rybelsus was inadequate because it did not warn and/or adequately warn of all possible adverse side effects of NAION and permanent vision loss.

214. At all relevant times, the label for Rybelsus was inadequate because it did not warn and/or adequately warn that Rybelsus had not been sufficiently and/or adequately tested for safety risks, including NAION.

215. The labels for Rybelsus were inadequate because they did not warn and/or adequately warn of all possible adverse side effects concerning the failure and/or malfunction of Rybelsus.

216. Defendant's failure to warn of the above was the proximate cause of Plaintiff's injuries, harm, and economic loss, from which Plaintiff continues to suffer.

217. Defendant's failure to warn of the significant risks of Rybelsus use prevented Plaintiff and Plaintiff's treating physicians from conducting a proper assessment of the risks and benefits of using Rybelsus .

218. Had Plaintiff and/or Plaintiff's treating physicians been properly warned of the significant risks of Rybelsus, Plaintiff would not have elected to begin and/or continue Rybelsus .

219. Reasonable, safer alternative treatments were available to Plaintiff and/or Plaintiff's treating physicians had they been warned of these significant risks outlined herein.

220. As a direct and proximate result of Defendant's conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of Rybelsus, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental

anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff respectfully requests that Plaintiff be granted relief against Defendants, as contained in the Prayer For Relief.

## COUNT IV
## NEGLIGENCE

221. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

222. At all relevant times, Defendant engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Rybelsus and placed these drugs into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendant.

223. Defendant, as the holder of NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

224. At all relevant times, Defendant had a duty to exercise reasonable care in the manufacture, marketing, advertisement, supply, storage, transport, packaging, sale, and distribution of Rybelsus products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that did not cause users to suffer from unreasonable, dangerous side effects without an adequate warning—when used alone or in foreseeable combination with other drugs.

225. Defendant failed to exercise ordinary care in the labeling, design, manufacturing, testing, marketing, distribution and/or sale of Rybelsus in that Defendant knew or should have known these drugs created a high risk of unreasonable harm to Plaintiff and other users.

226. Defendant had no reason to believe that intended and foreseeable users of Rybelsus, such as Plaintiff, would realize the potential harm from use of these products.

227. Defendant failed to exercise reasonable care to inform users, such as Plaintiff, of Rybelsus's risk of serious and potentially irreversible vision issues and harm to the optic nerve.

228. Defendant breached its duty of care to the Plaintiff and Plaintiff's physicians, in the testing, monitoring, and pharmacovigilance of Rybelsus.

229. In disregard of its duty, Defendant committed one or more of the following negligent acts or omissions:

a. Manufacturing, producing, overpromoting, formulating, creating, developing, designing, selling, and distributing Rybelsus without thorough and adequate pre- and post-market testing of the products;

b. Manufacturing, producing, overpromoting, advertising, formulating, creating, developing, and designing, and distributing Rybelsus while negligently and intentionally concealing and failing to disclose clinical data which demonstrated the risk of serious harm associated with the use of Rybelsus;

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Rybelsus was safe for their intended use;

d. Failing to disclose and warn of the product defect to the medical community, and consumers that Defendant knew and had reason to know that Rybelsus was indeed unreasonably unsafe and unfit for use by reason of the product defects and risk of harm to its users;

e. Failing to warn Plaintiff, the medical and healthcare community, and consumers that the Rybelsus's risk of harm was unreasonable and that there were safer and effective alternative products available to Plaintiff and other consumers;

f. Failing to provide adequate instructions, guidelines, and safety precautions

to those persons to whom it was reasonably foreseeable would use Rybelsus;

g. Advertising, marketing, and recommending the use of Rybelsus, while concealing and failing to disclose or warn of the dangers known by Defendant to be connected with, and inherent in, the use of this product;

h. Representing that Rybelsus was safe for their intended use when in fact Defendant knew and should have known the product were not safe for their intended purpose;

i. Continuing to manufacture and sell Rybelsus with the knowledge that Rybelsus is unreasonably unsafe and dangerous;

j. Failing to use reasonable and prudent care in the design, research, testing, manufacture, and development of Rybelsus so as to avoid the risk of serious harm associated with the use of semaglutide. Failing to design and manufacture Rybelsus so as to ensure these drugs were at least as safe and effective as other similar products;

k. Failing to design and manufacture Rybelsus was reasonably safe for their intended purpose in violation of objective safety standards;

l. Failing to ensure that Rybelsus were accompanied by proper and accurate warnings about requiring baseline visual examinations and regular eye examinations while using the drug;

m. Failing to ensure that Rybelsus were accompanied by proper and accurate warnings about possible adverse side effects associated with the use of Rybelsus and that use of semaglutide created a high risk of severe, permanent injuries to vision; and

n. Failing to conduct adequate testing, including pre-clinical and clinical testing, and post-marketing surveillance to determine the safety of Rybelsus.

230. A reasonable manufacturer, designer, distributor, promotor, or seller under the same or similar circumstances would not have engaged in the aforementioned acts and omissions.

231. As a direct and proximate result of the Defendant's negligent testing, monitoring, and pharmacovigilance of Rybelsus, Defendant introduced products they knew or should have known would cause injury to the optic nerve, NAION and resulting serious and permanent injuries

to an individual's vision, and Plaintiff has been injured catastrophically and sustained severe and permanent pain, suffering, disability, and impairment, loss of enjoyment of life, loss of care, comfort, and economic damages.

232. As a direct and proximate result of Defendant's conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of Rybelsus, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff respectfully requests that Plaintiff be granted relief against Defendant, as contained in the Prayer For Relief.

**COUNT V**
**NEGLIGENT MISREPRESENTATION AND MARKETING**

233. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

234. At all relevant times, Defendant engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Rybelsus and placed these drugs into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendant.

235. Defendant, as the holder of NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

236. At all relevant times, Defendant negligently provided Plaintiff, Plaintiff's healthcare providers, and the general medical community with false or incorrect information or omitted or failed to disclose material information concerning Rybelsus, including, but not limited to, misrepresentations regarding the safety and known risks of Rybelsus.

237. The information distributed by the Defendant to the public, the medical community, Plaintiff and Plaintiffs' healthcare providers, including advertising campaigns, labeling materials, print advertisements, commercial media, was false and misleading and contained omissions and concealment of truth about the dangers of Rybelsus.

238. Defendant's conduct had the capacity to deceive and/or purpose in making these misrepresentations was to deceive and defraud the public and the medical community, including Plaintiff and Plaintiff's health care providers; to falsely assure them of the quality of Rybelsus and induce the public and medical community, including Plaintiff and Plaintiff's healthcare providers to request, recommend, purchase, and prescribe Rybelsus.

239. Defendant's intent and purpose in making these misrepresentations was to deceive and defraud the public and the medical community, including Plaintiff and Plaintiff's health care providers; to falsely assure them of the quality of Rybelsus and induce the public and medical community, including Plaintiff and Plaintiff's healthcare provider to request, recommend, purchase, and prescribe Rybelsus.

240. Defendant had a duty to accurately and truthfully represent and market to the medical and healthcare community, Plaintiff, Plaintiff's healthcare providers and the public, the known risks of Rybelsus, including its propensity to cause permanent vision loss, NAION and injury to the optic nerve.

241. Defendant made continued omissions in the Rybelsus labeling, including promoting it as safe and effective while failing to warn of its propensity to cause permanent vision loss, NAION and injury to the optic nerve.

242. Defendant made additional misrepresentations beyond the product labeling by representing Rybelsus as a safe and effective treatment for type 2 diabetes with only minimal risks.

243. Defendant misrepresented and overstated the benefits of Rybelsus to Plaintiff, Plaintiff's treaters, and the medical community without properly advising of the known risks to permanent vision loss.

244. In reliance upon the false and negligent misrepresentations and omissions made by the Defendants, Plaintiff and Plaintiff's healthcare providers were induced to, and did use Rybelsus, thereby causing Plaintiff to endure severe and permanent injuries.

245. In reliance upon the false and negligent misrepresentations and omissions made by the Defendant, Plaintiff and Plaintiff's healthcare providers were unable to associate the injuries sustained by Plaintiff with Plaintiff's Rybelsus use before it was too late. Defendant knew or should have known that the Plaintiff, Plaintiff's healthcare providers, and the general medical community did not have the ability to determine the true facts which were intentionally and/or negligently concealed and misrepresented by the Defendant.

246. Plaintiff and Plaintiff's healthcare providers would not have used or prescribed Rybelsus had the true facts not been concealed by the Defendant.

247. Defendant had sole access to many of the material facts concerning the defective nature of Rybelsus and its propensity to cause serious and dangerous side effects.

248. At the time Plaintiff was prescribed and administered Rybelsus, Plaintiff and Plaintiff's healthcare providers were unaware of Defendant's negligent misrepresentations and omissions.

249. The Defendant failed to exercise ordinary care in making representations concerning Rybelsus while they were involved in their manufacture, design, sale, testing, quality assurance, quality control, promotion, marketing, labeling, and distribution in interstate commerce, because the Defendant negligently misrepresented Rybelsus's risk of unreasonable and dangerous adverse side effects.

250. Plaintiff and Plaintiff's healthcare providers reasonably relied upon the misrepresentations and omissions made by the Defendant, where the concealed and misrepresented facts were critical to understanding the true dangers inherent in the use of the Rybelsus.

251. Plaintiff and Plaintiff's healthcare providers' reliance on the foregoing misrepresentations and omissions was the direct and proximate cause of Plaintiff's injuries.

252. As a direct and proximate result of reliance upon Defendant's negligent misrepresentations, Plaintiff suffered bodily injury and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff respectfully requests that Plaintiff be granted relief against Defendant, as contained in the Prayer For Relief.

**COUNT VI**
**BREACH OF EXPRESS WARRANTY**
**N.J. Stat. Ann. § 12A:2-101 *et* seq., FL Stat. § 672.313, *et seq.***

253. Plaintiff incorporates by reference each and every preceding paragraph as though

fully set forth herein.

254. At all relevant times, Defendant engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Rybelsus and placed them into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendant.

255. Defendant, as the holder of NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

256. Defendant expressly warranted to Plaintiff, Plaintiff's healthcare providers, and the general public, by and through Defendant and/or its authorized agents or sales representatives, in publications, labeling, the internet, and other communications intended for physicians, patients, Plaintiff, and the general public, that Rybelsus were safe, effective, fit and proper for their intended use.

257. Rybelsus materially failed to conform to those representations made by Defendant, in package inserts and otherwise, concerning the properties and effects of Rybelsus, which Plaintiff purchased and injected in direct or indirect reliance upon these express representations. Such failures by Defendant constituted a material breach of express warranties made, directly or indirectly, to Plaintiff concerning Rybelsus sold to Plaintiff.

258. Defendant expressly warranted that Rybelsus were safe and well-tolerated. However, Defendant did not have adequate proof upon which to base such representations, and, in fact, knew or should have known that Rybelsus was particularly dangerous to the well-being of Plaintiff and Plaintiff’s vision.

259. Rybelsus do not conform to those express representations because they are defective, not safe, and have serious adverse side effects.

260. Plaintiff and Plaintiff's physicians justifiably relied on Defendants' representations regarding the safety of Rybelsus, and Defendant's representations became part of the basis of the bargain.

261. Plaintiff and Plaintiff's healthcare providers justifiably relied on Defendant's representations that Rybelsus was safe and well-tolerated in their decision to ultimately prescribe, purchase and use the drug.

262. Plaintiff's healthcare providers justifiably relied on Defendant's representations through Defendant's marketing and sales representatives in deciding to prescribe Rybelsus over other alternative treatments on the market, and Plaintiff justifiably relied on Defendant's representations in deciding to purchase and use the drug.

263. Plaintiff purchased and used Rybelsus without knowing that drug is not safe and well-tolerated, but that Rybelsus instead causes significant and irreparable vision loss and eye damage.

264. As a direct and proximate result of Defendant's conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of Rybelsus , Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff respectfully requests that Plaintiff be granted relief against

Defendant, as contained in the Prayer For Relief.

**COUNT VII**
**BREACH OF IMPLIED WARRANTY**

265. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

266. At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Rybelsus, and placed it into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

267. Defendant, as the holder of NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

268. Defendant was the seller of Rybelsus and sold Rybelsus to be taken for treatment of type 2 diabetes.

269. When Rybelsus was prescribed by Plaintiff's physician and taken by Plaintiff, the product was being prescribed and used for the ordinary purpose for which it was intended.

270. Defendant impliedly warranted their product, which they manufactured and/or distributed and sold, and which Plaintiff purchased and used, to be of merchantable quality and fit for the common, ordinary, and intended uses for which the product was sold.

271. Defendant breached their implied warranties of the Rybelsus product because the Rybelsus sold to Plaintiff was not fit for its ordinary purpose to help with type 2 diabetes.

272. Rybelsus would not pass without objection in the trade; they are not of fair average quality; they are not fit for their ordinary purposes for which the products are used; were not

adequately contained, packaged and labeled; and fail to conform to the promises or affirmations of fact made on the container or label.

273. Defendant's breach of their implied warranties resulted in use of the unreasonably dangerous and a defective product by Plaintiff, which placed Plaintiff's health and safety at risk and resulted in the damages alleged herein.

WHEREFORE, Plaintiff respectfully requests that Plaintiff be granted relief against Defendant, as contained in the Prayer For Relief.

**COUNT VIII**
**VIOLATION OF NEW JERSEY CONSUMER FRAUD ACT AND/OR FLORIDA CONSUMER PROTECTION ACT**
**N.J.S.A. 56:8 *et seq*. and FL Stat. § 501.211 (2024), *et seq.***

274. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

275. Plaintiff purchased and used Rybelsus primarily for personal use and therefore suffered ascertainable losses as a result of Defendant's actions in violation of N.J.S.A. 56:8 *et seq*. and FL Stat. § 501.211 (2024), *et seq*.

276. Had Defendant not made affirmative misrepresentations, material omissions, and engaged in the deceptive conduct described herein, Plaintiff would not have purchased Rybelsus and would not have incurred damages.

277. Defendant engaged in wrongful conduct while at the same time obtaining, under false pretenses, money from Plaintiff that would not have been paid had Defendant not engaged in unfair and deceptive conduct.

278. Despite knowing the falsity and misleading nature of their claims, Defendant engaged in unconscionable commercial practices, deception, fraud, false promise, misrepresentation and/or the knowing concealment, suppression or omission of material facts

relative to the safety and efficacy of Rybelsus.

279. Defendant intended such actions to mislead patients, healthcare providers, and the general public with respect to the safety and efficacy of Rybelsus.

280. Such actions did, in fact, mislead patients, healthcare providers, and the general public with respect to the safety and efficacy of Rybelsus.

281. Defendant had a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, labeling, development, manufacture, promotion, and sale of Rybelsus.

*282.* Defendant's deceptive, unconscionable, or fraudulent representations and material omissions to patients, physicians and consumers, including CARL SEAGROVES II, constituted unfair and deceptive acts and trade practices in violation of N.J.S.A. 56:8 *et seq*. and FL Stat. § 501.211 (2024), *et seq.*

283. As a direct and proximate result of Defendant's conduct, including the inadequate warnings, dilution or lack of information, lack of adequate testing and research, and the defective and dangerous nature of Rybelsus, LORNE HARARI suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff respectfully requests that Plaintiff be granted relief against Defendant, as contained in the Prayer For Relief.

**COUNT IX**
**PUNITIVE DAMAGES UNDER COMMON LAW,**
**PUNITIVE DAMAGES ACT (N.J.S.A. 2A:15-5.9, et seq.), PRODUCT LIABILITY ACT (N.J.S.A. 2A:58C-1 *et seq.*)**

284. Plaintiff incorporates by reference each and every preceding paragraph as though

fully set forth herein.

285. The acts and omissions of Defendant described herein consisted of oppression, fraud, and/or malice, and were done with advance knowledge, conscious disregard of the safety of others, and/or ratification by Defendants' officers, directors, and/or managing agents.

286. Defendant's actions amounted to actual malice or reckless indifference to the likelihood of harm associated with their acts and omissions.

287. Defendant sold Rybelsus to Plaintiff and other consumers throughout the United States despite their knowledge that Rybelsus cause the problems as set forth in this Complaint, thereby causing the severe and debilitating injuries suffered by Plaintiff.

288. Defendant misled both the medical community and the public, including Plaintiff and his physicians, by making false representations about the safety and effectiveness of Rybelsus and by failing to provide adequate instructions concerning its use.

289. Defendant downplayed, understated, and/or disregarded their knowledge of the serious and permanent side effects and risks associated with the use of Rybelsus despite available information demonstrating that drug could cause NAION and irreversible vision loss.

290. Defendant was or should have been in possession of evidence demonstrating that Rybelsus use could cause NAION and irreversible vision loss. Nevertheless, Defendant continues to market Rybelsus by providing false and misleading information with regard to their safety and effectiveness.

291. Defendant failed to provide warnings that would have dissuaded health care professionals from using Rybelsus, thus preventing health care professionals, including Plaintiff's prescribing physician, and consumers, including Plaintiff, from weighing the true risks against the benefits of using Rybelsus.

292. As a proximate result of Defendant's acts and omissions, Plaintiff was diagnosed with NAION and suffers from irreparable vision loss due to Plaintiff's use of Rybelsus.

293. As a result of Plaintiff's injuries, Plaintiff has endured substantial pain and suffering, has incurred significant expenses for medical care, and will remain economically challenged and emotionally harmed.

294. Plaintiff has suffered and will continue to suffer economic loss and has otherwise been emotionally and economically injured.

295. Defendant has engaged in conduct entitling Plaintiff to an award of punitive damages pursuant to Common Law principles and the statutory provisions of New Jersey law.

296. Defendant's actions were performed willfully, intentionally, and with reckless disregard for the rights of Plaintiff and the public.

297. Plaintiff's injuries and damages are severe, permanent and will continue into the future. As a result, Plaintiff seeks actual and punitive damages from the Defendant.

298. Defendant's conduct was committed with knowing, conscious and deliberate disregard for the rights and safety of consumers, including Plaintiff, thereby entitling Plaintiff to punitive damages in an amount appropriate to punish the Defendant and deter them from similar conduct in the future.

299. Consequently, Defendant is liable for punitive damages in an amount to be determined by the jury.

WHEREFORE, Plaintiff respectfully requests that Plaintiff be granted relief for punitive damages against the Defendant, each of them, in a fair and reasonable amount sufficient to punish Defendant and deter them and others from engaging in similar conduct in the future, costs expended herein, and such further and other relief as the Court deems just and appropriate.

## EQUITABLE TOLLING OF STATUTES OF LIMITATIONS

300. Defendant is estopped from relying on the statute of limitations defense because Defendant actively concealed information concerning known risks, side effects, and defects in Rybelsus. Instead of revealing such information to the FDA or the public, Defendant has continued to represent Rybelsus as safe for its intended use.

301. Defendant is and was under a continuing duty to disclose the true character, quality and nature of risks and dangers associated with Rybelsus. Because of Defendant's purposeful and fraudulent concealment of material information concerning the true character, quality and nature of risks of such products, Defendant is estopped from relying on any statute of limitations defense.

**DEMAND FOR JURY TRIAL**

302. Plaintiff demands a trial by jury on all the triable issues within this pleading.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein, and prays for judgment in his favor and against Defendant awarding the following:

1. A monetary award, sufficient to compensate Plaintiff for the following categories of damages:
    a. actual or compensatory damages in such amount to be determined at trial and as provided by applicable law;
    b. actual and treble damages in such amount to be determined by this Court and as provided by law;
    c. exemplary and punitive damages sufficient to punish and deter Defendant and others from future wrongful practices;
    d. pre-judgment and post-judgment interest;
    e. costs including court costs, and other litigation expenses; and
    f. any other relief the Court may deem just and proper.

Dated: November 16, 2026

Respectfully Submitted,

______________

*/s/ Daniel A. Nigh*

Daniel A. Nigh (FL Bar No. 30905)
**NIGH GOLDENBERG RASO & VAUGHN, PLLC**
14 Ridge Square NW, Third Floor
Washington, D.C. 20016
Telephone: 202-792-7927
Facsimile: 202-792-7927
dnigh@nighgoldenberg.com
*Attorney for Plaintiff*

**RULE 1:38-7(c) CERTIFICATION OF COMPLIANCE**

I certify that confidential personal identifiers have been redacted from documents now submitted to the court and will be redacted from all documents submitted in the future in accordance with Rule 1:38- 7(b).

Dated: Respectfully Submitted,

*/s/ Daniel A. Nigh*

Daniel A. Nigh (FL Bar No. 30905)
**NIGH GOLDENBERG RASO & VAUGHN, PLLC**
14 Ridge Square NW, Third Floor
Washington, D.C. 20016
Telephone: 202-792-7927
Facsimile: 202-792-7927
dnigh@nighgoldenberg.com
*Attorney for Plaintiff*

**DEMAND FOR TRIAL BY JURY**

Plaintiff demands a trial by jury on all issues.

Dated: November 16, 2026

Respectfully Submitted,

____________

*/s/ Daniel A. Nigh*

Daniel A. Nigh (FL Bar No. 30905)
**NIGH GOLDENBERG RASO**
**& VAUGHN, PLLC**
14 Ridge Square NW, Third Floor
Washington, D.C. 20016
Telephone: 202-792-7927
Facsimile: 202-792-7927
dnigh@nighgoldenberg.com
*Attorney for Plaintiff*

**CERTIFICATION**

I hereby certify that to my knowledge the within matter in controversy is not the subject of any other action pending in any court or of a pending arbitration proceeding, and that no other action or arbitration proceeding is contemplated with the exception of a possible workers' compensation claim. I have no knowledge at this time of any non-party who should be joined in this action.

Dated: November 16, 2026

Respectfully Submitted,

*/s/ Daniel A. Nigh*

Daniel A. Nigh (FL Bar No. 30905)
**NIGH GOLDENBERG RASO & VAUGHN, PLLC**
14 Ridge Square NW, Third Floor
Washington, D.C. 20016
Telephone: 202-792-7927
Facsimile: 202-792-7927
dnigh@nighgoldenberg.com
*Attorney for Plaintiff*